Arthur A. Hartinger (State Bar No. 121521)
Geoffrey Spellberg (State Bar No. 121079)
Laura Lee Briggs (State Bar No. 197068)
MEYERS NAVE, RIBACK, SILVER & WILSON
555 12th Street, Suite 1500
Oakland, California 94607
Telephone: (510) 808-2000
Facsimile: (510) 444-1108
Email: ahartinger@meyersnave.com
Email: gspellberg@meyersnave.com
Email: lbriggs@meyersnave.com

Attorneys for Defendant
City of Stockton

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAIME HUGHES, MARY CORONADO, AUDREY MILLS, VIRGINIA CARDOZA, KAREN DELUCCHI, JOLENE GIBSON, BARBARA HEDRICK, SUZANNE HENNING, WILL JOHNSON, LINDA MAGER, MARIA MACIAS, CARL MORROW, CANDICE PRICE, VIRGINIA RUIZ, CARMEN SIMMONS, TREASA TREDWELL, MARINA TORRES, SHEILA WALL, LORIE WEISS and KATHI LYNN CORONADO, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF STOCKTON; and DOES 1 through 100, in their individual capacities, <br><br> Defendants. | Case No.: CIV. S-03 0166 MCE-DAD <br><br> **DEFENDANT CITY OF STOCKTON'S DEPOSITION EXCERPTS TO BE OFFERED AT TRIAL** <br><br><br> Date: June 28, 2005 <br> Time: 2 p.m. <br> Dept.: 3, 15th Floor <br><br> Judge Morrison C. England, Jr. <br><br> Complaint Filed: January 28, 2003 <br> Trial Date: June 29, 2005 |

Pursuant to Section XIV(B) of this Court's Final Pre-Trial Order, Defendant City of Stockton ("City"), hereby submits the following deposition excerpts to be offered at trial. Defendant will offer some of these excerpts depending upon Court rulings on in limine motions and other rulings.

**DEPOSITION OF VIRGINIA CARDOZA:**

**A.**   **Pages 21:23-22:25**

Q.  Do you like working 24-hour shifts?

A.  Yes.  Yes.

1   Q. Can you tell me why it is you like 24-hour shifts?

2   A. Yeah.

3   Q. Just give me reasons why you might like them.

4   A. It's easier on child care.

5   Q. And is it easier on child care because you only work ten shifts in a month?

6   A. Yes.

7   Q. Do you also find that it provides you more time with your family?

8   A. Yes.

9   Q. Have you ever told -- Has anyone ever asked you at the fire department whether

10  you prefer 24-hour shifts?

11  A. No.

12  Q. How did you like the 12-hour shifts --

13  A. I didn't.

14  Q. -- when you were working graveyard? Sorry.

15  A. I didn't like them at all.

16  Q. And why didn't you like them?

17  A. Very trying on your body.

18  Q. And did you have to work more shifts in a week?

19  A. Yes.

20  **B.   Pages 27:4-28:25**

21  Q. A fire telecommunicator working in a 24-hour shift, do you sleep while you're on

22  duty or do you have sleep breaks during your shift period?

23  A. Yes.

24  Q. And are you aware of whether there is a sleep schedule?

25  A. Yes.

26  Q. And can you please tell me what that schedule is?

27  A. We have two sleep shifts. You go down at 1900 hours to 2230, and then you're

28  up from 2230 to 0400, down again from 0400 to 0730. And then the second shift sleeps in

1    between there, from 2230 to 0400.

2         Q.  Is that the sleep schedule that you are provided when you're working a shift?

3         A.  Yes.

4         Q.  Do you presently keep a record of sleep hours that you take while you're working

5    a shift?

6         A.  No.

7         Q.  Do you know if anyone is keeping a record of your sleep time while you're on

8    shift?

9         A.  No.

10        Q.  Do you know whether presently sleep hours are deducted from your hours

11   worked?

12        A.  Can you ask that again?

13        Q.  Are you aware of whether the hours that you are sleeping while you're working

14   your shift are deducted from your hours worked?

15        A.  No, they're not deducted.

16        Q.  At any time that you were working for the City are you aware of whether a sleep

17   log or a sleep sheet or any document that covered your sleep hours was maintained?

18        A.  Yes.

19        Q.  And how do you understand that document was called; what is your

20   understanding of the name of that document?

21        A.  Sleep log.

22        Q.  Sleep log.  And do you know when the sleep log stopped, the practice of keeping

23   a sleep log was stopped?

24        A.  January of 2001.

25        Q.  So if you started 24-hour shifts sometime in March, there is a sleep log kept for

26   your sleep time from March 2000 to January 2001?

27        A.  Yes, with the exception of the times that I was on graveyard.

28   ///

Def City Of Stockton's Depo Excerpts to be          3          *Hughes, et al. v. City of Stockton, et al.*
Offered at Trial                                                Case No.  CIV. S-03 0166 MCE-DAD

**C.**     **Pages 29:4-18**

Q.  Do you know if during that time period, when a sleep log was maintained for you, whether any hours that you slept were deducted from your hours worked?

A.  Yes.

Q.  And what is your understanding of that practice?

A.  They deducted three hours a shift -- three hours every 24-hour shift.  Excuse me.

Q.  Was the sleep schedule that you just described for me, of 7:00 to 10:30 and then --

A.  4:00 to 7:30.

Q.  Right.  -- is that the same schedule that was in use back in 2000?

A.  Yes.

**D.**     **Pages 30:16-22**

Q.  So back in 2000 would the sleep schedule allow the fire telecommunicators to sleep more than three hours?

A.  The sleep schedule, yes.

Q.  But only three hours was deducted from your shift?

A.  Yes.

**DEPOSITON OF KATHI CORONADO:**

**A.**     **Pages 59:1-5**

Q.  Did anyone ever communicate to you that fire telecommunicators -- In that time period, did anyone ever communicate to you that fire telecommunicators were granted a raise?

A.  No.

**DEPOSITION OF MARY CORONADO:**

**A.**     **Page 22:1-12**

Q.  So you've always worked 24-hour shifts?

A.  Yes.

Q.  How do you like working 24-hour shifts?

1    A. I like 24-hour shifts. I've been doing it for a long time.

2    Q. Why do you like 24-hour shifts?

3    A. Why do I like 24-hour shifts?

4    Q. Yeah.

5    A. List all the reasons why?

6    Q. Sure.

7    A. I like the time off in between that I spend with my family.

8  **B.    Pages 49:6-50:2**

9    Q. So when did you first become aware of it, just through rumors?

10    A. We were told by our captain that -- and I don't remember the exact date, but at

11  this particular date it would be reflected in our regular pay, rather than in the Overtime line of

12  our paycheck.

13    Q. And when you say, "it would be reflected in our regular pay," what do you mean?

14    A. The FLSA -- What we used to get paid as FLSA overtime was now going to be

15  shown in our regular pay. It used to show in our Overtime line of our paycheck, sometimes.

16  Sometimes it didn't. But, that it would now be reflected in the regular pay. That it was now -

17  - It was now our base salary.

18    Q. So it was communicated to you that your base salary included regularly-

19  scheduled overtime?

20    A. I don't recall it being referred to as regular scheduled overtime because those

21  were just our regular hours. Regular scheduled overtime was not -- that's not our term. It's

22  not -- That's not the dispatcher term. These are regular scheduled hours for us.

23  **C.    Page 50:9-15**

24    Q. So your base salary would include all the hours that you normally work?

25    A. My understanding is that the regular hours that we work, including the 48-hour

26  work weeks we had and the 32-hour work weeks we had, was now going to show as our

27  regular salary. Those were our regular hours and it was now going to show in the line as

28  regular pay.

**D.**      **Pages 57:22-58:14**

Q.  Okay.  Are the fire telecommunicators provided a sleep or rest break during their 24-hour shift?

A.  Yes.

Q.  And is that pursuant to some type of sleep schedule?

A.  We have a sleep schedule, yes.

Q.  Can you tell me what that sleep schedule is?

A.  The hours that are set for it are -- the first -- the first sleep schedule is 7:00 to 10:30 at night.  And then that -- those people get up.  And then the second group goes down from 10:30 until 4:00 o'clock in the morning.  And then the third sleep shift is 4:00 to 7:00.

Q.  And so do you take sleep or rest breaks while you're on duty?

A.  If the opportunity let us, yes, we do.

**DEPOSITION OF KAREN DELUCCHI:**

**A.**      **Page 48:11-22**

Q.  Do you know if Paul Goyette's office sent it to your house?

A.  Yes.

Q.  You read the letter when you received it?

A.  Yes.

Q.  But you can't recall the exact substance of it now?

A.  No.

Q.  Do you know if the letter indicated that a grievance filed by the telecommunicators would not be successful?

A.  Yes.

**B.**      **Page 65:3-7**

Q.  Now, this increase in salary in an eight-month period is about 25 percent.  Have you ever received a 25 percent raise in an eight-month period while working for the City?

A.  No.

///

**DEPOSITION OF JOLENE GIBSON:**

**A.** <u>Pages 14:8-15:7</u>

Q. Okay. How do you like working 24-hour shifts?

A. You mean what is my preference?

Q. Do you like working 24-hour shifts?

A. I like working 24-hour shifts.

Q. Why do you like working 24-hour shifts?

A. Just my preference. My husband works 24-hour shifts also, so it works for us.

Q. Is there anything else that you like about working 24-hour shifts?

A. I mean, I could -- I don't know if I need to --

MS. MILLER: She doesn't want you to make anything up. Just tell her if there's anything else.

THE WITNESS: It's just I prefer to work that shift. I don't know. I've worked a lot of different other shifts, and 24's work for me. I just like them.

MS. BRIGGS: Q. Do you like the time off it affords you?

A. Yes.

Q. Do you have family?

A. Yes.

Q. It allows you to spend more time with your family?

A. Sometimes.

**B.** <u>Page 18:12-23</u>

Q. Okay. Why were you moved off the 12-hour shifts in January of 2001?

A. I don't know.

Q. Did you ask to be moved off of them?

A. No.

Q. Did you ever tell anyone that you preferred working 24-hour shifts in that time period?

A. I probably did, but I don't remember who I told.

1    Q. Did you ever express displeasure with the graveyard shift in that time period?

2    A. Yes.

3  **C.    Pages 24:15-25:17**

4    Q. Do you presently -- Are you presently provided with a sleep schedule while you're

5  on duty?

6    A. Can you explain to me what --

7    Q. During your shift are you allowed an opportunity to sleep?

8    A. Yes.

9    Q. And do you have an understanding of what the sleep schedule is for the fire

10  telecommunicators?

11    A. It's not a sleep schedule.

12    Q. Is it a sleep rotation?

13    A. It's a period of time where we're allowed to sleep.

14    Q. And can you explain to me what that -- Is it a set period of time?

15    A. There are certain times, yes, but you're not guaranteed that sleep.

16    Q. But is there a sleep schedule that the fire --

17    A. It's not a sleep schedule.

18    Q. Can you describe for me what it is?

19    A. It's -- There's -- What it is is an evening at 7:00 o'clock, usually there's three

20  people that rest, and then there's three people that are up.  And then there's a certain

21  amount of time when they get up and the other people go down and rest.

22    But, you're not guaranteed that amount of time to rest.  You're still available -- You're

23  still available to come to the floor at any time.

24  **D.    Page 26:2-5**

25    MS. BRIGGS:  Q. At any time in the last three years have you ever been afforded an

26  opportunity to sleep during your 24-hour shifts?

27    A. Yes.

28  ///

**E.      Pages 53:13-21**

I'm curious to know if since February of 2000 have you never been permitted to sleep while on duty.

A. Yes, we're permitted to sleep.

Q. Have you ever slept on duty since February of 2000?

A. When you say slept on duty --

Q. I mean, not taken a sleep break during your shift.

A. Yes, I've slept.

**F.      Pages 55:18-56:11**

MS. BRIGGS: I'm handing you a document called "ECD Shift Staffing Summary," for May of 2000.

Q. Have you seen a document that looks like this?

A. Yes.

Q. And were you on duty for this shift on May 9th, 2000?

A. Yes.

Q. And do you see your name here?

A. Yes.

Q. And is that your initials next to the number 3 on the right?

A. Yes.

Q. And can you tell me what it is your initialing there?

A. The sleep hours.

Q. Do you recall if you were signing off because you were permitted to sleep on that shift?

A. Yes.

**DEPOSITION OF BARBARA HEDRICK:**

**A.      Page 14:5-6**

Q. How do you like working 24-hour shifts?

A. They're fine.

1

**B.**     <u>Page 26:6-15</u>

2

    Q. Are you presently -- As a fire telecommunicator, are you presently provided with a

3

sleep or a rest period during your 24-hour shift?

4

    A. What do you mean?

5

    Q. Is there a sleep schedule for the fire telecommunicators?

6

    A. Yes.

7

    Q. Is there a sleep rotation for the fire telecommunicators?

8

    A. Yes.

9

**C.**     <u>Pages 26:23-27:15</u>

10

    Q. Are you familiar with the term "down up down"?

11

    A. Yes.

12

    Q. What does that mean?

13

    A. It means that some people get to go to bed at 7:00, they get up at 10:30, they're

14

up till 4:00, then they go back to sleep.

15

    Q. Have you just described for me a sleep schedule for the fire telecommunicators?

16

    A. It's not guaranteed.

17

    Q. That wasn't my question.  Have you just described for me a sleep schedule for

18

the fire telecommunicators?

19

    MS. MILLER:  Objection, argumentative.

20

    MS. BRIGGS:  Q.  You can answer.

21

    A. It's a rotation.

22

    Q. What is the other rotation?

23

    A. From 10:30 to 4:00 you would sleep.

24

**D.**     <u>Pages 43:20-44:22</u>

25

    Q. Are you speaking of a specific letter when you say, "I don't have the letter"?

26

    A. He wrote a letter back to the people that filed it.

27

    Q. And do you know -- Have you seen the letter?

28

    A. Yes.

1    Q. When did you first see the letter?

2    A. When they got it back.

3    Q. And do you recall what the letter stated?

4    A. Not exactly.

5    Q. Do you recall if the letter indicated that a grievance on behalf of the fire

6  telecommunicators would not be filed?

7    A. I'd have to see the letter.

8    Q. Do you recall if other fire telecommunicators were attempting to file a grievance?

9    A. I don't know.

10    Q. But you did read the letter shortly after it was sent to the fire telecommunicators?

11    A. Initially.

12    Q. But you don't have any recollection of that letter right now?

13    A. Not specifically.

14    Q. Do you have any general recollection of that letter?

15    A. In general, it basically told us we didn't have any reason to argue.

16  **DEPOSITION OF SUZANNE HENNING:**

17  **A.**    <u>**Pages 17:16-18:21**</u>

18    Q. Do you like working 24-hour shifts?

19    A. Yes.

20    Q. And why is that?

21    A. Because I get more days off during the week with my kids.

22    Q. And when you say "more days off," more days off compared to what?

23    A. Compared to somebody who works 9:00 to 5:00, Monday through Friday.

24    Q. And you already said that in a one-month period you only work nine to eleven

25  shifts in a month?

26    A. (Nods head.)

27    Q. Have you ever told anyone at the City that you prefer working 24-hour shifts?

28    A. Yes.

1    Q. Who have you told?

2    A. I believe everybody on my shift and other people, if they've been there, talked

3    about it in general.

4    Q. Who's on your shift?  I'm sorry.  When you say everybody on your shift, presently

5    who's on your shift?

6    A. Yes.

7    Q. Who's on your shift presently?

8    A. Audrey Mills.

9    Q. Is she's your supervisor?

10   A. Correct.  Virginia Cardoza, Sheila Wall, Lorie Weiss, Alicia Holcombe.  That's it.

11   Q. How do you spell Alicia's last name?

12   A. I believe it's H-O-L-C-O-M-B-E.

13   **B.**    **Pages 47:2-10**

14   Q. And do you always take a sleep period for every shift since you've worked there?

15   A. Not the whole period, but some time, yes.

16   Q. So do you always take a sleep period for --

17   A. Yes.

18   Q. -- every shift?

19   A. Not a -- Yes.  Not a full period but, yes, some type of partial period.

20   **C.**    **Pages 30:21-31:11**

21   Q. Okay.  Do you know if whether your current salary includes an amount -- includes

22   compensation for your regularly-scheduled overtime?

23   A. I believe it does.

24   Q. And what is your belief?  What is your understanding of that?

25   THE WITNESS:  That they're paying us their idea of their base salary for the hours

26   we work whether or not we've worked more or not.

27   MS. BRIGGS:  Q.  Okay.  And do you know whether that base salary includes -- Let

28   me back up.  When you pick up an extra shift in any work week, are you paid at an overtime

1  rate?  Are you paid overtime?

2      A.  Yes.  Yes.

3  **DEPOSITION OF JAIME HUGHES:**

4  **A.**  **Pages 23:24-24:12**

5      Q.  Okay.  So what is your understanding as to why the base salary was raised?

6      A.  What the City told us is --

7      MR. TALBOT:  Just to clarify, for the firefighters -- fire dispatchers?

8      MS. BRIGGS:  Q.  Firefighters.  For the fire dispatchers.

9      A.  I'm sorry.  For fire dispatchers.  What they told us was that they were going to roll

10  what had previously been written on an overtime line for the scheduled overtime, that they

11  were going to put that into our base wage so they could begin to pay PERS on it, so that it

12  would become a portion of our retirement benefit.

13  **B.**  **Pages 36:7-37:4**

14      Q.  If all fire telecommunicators moved to a 12-hour shift, would the City have to find

15  a supervisor to work in that graveyard shift?

16      MR. TALBOT:  Objection.  Calls for speculation.

17      MS. BRIGGS:  Q.  If you know.

18      A.  I would think so, yes.

19      Q.  Each shift has a supervisor?

20      A.  Yes.

21      Q.  And presently the supervisors are Mary Coronado, yourself and Audrey Mills?

22      A.  That's correct.

23      Q.  Do you know whether Mary Coronado and Audrey Mills -- Do you know if Mary

24  Coronado would -- how she would take to having to work a graveyard shift?

25      MR. TALBOT:  Objection.  Calls for speculation.

26      MS. BRIGGS:  Q.  If you know.

27      A.  I don't think she'd like it.

28      Q.  How about Audrey Mills?

---

1   A. I don't think she would like it either.

2   Q. How about yourself?

3   A. I know I would not like it.

4   **C.      Pages 32:23-33:4**

5   Q. Do you recall whether any of the four individuals expressed to you that they did

6   not like the 12-hour shifts?

7   A. Yes. The two people working night shifts had trouble sleeping. And Virginia

8   Cardoza was one of those and had a small child and it was difficult for her to get adequate

9   rest.

10  **D.      Pages 42:19-43:10**

11  Q. So is it your understanding -- Strike that.

12  So in April or August of 2000, whenever it was that this change, to your knowledge,

13  took place, regularly-scheduled overtime was put into base salary?

14  MR. TALBOT: I'm going to -- Are you asking if that's her understanding of what

15  happened --

16  MS. BRIGGS: Yes.

17  MR. TALBOT: -- or -- okay.

18  THE WITNESS: From what I understand, the amount of money we had previously

19  earned for those regular -- for the overtime was rolled into our base wage.

20  MS. BRIGGS: Q. Okay. And it's your understanding that that was to compensate

21  fire telecommunicators for working 40 hours a week?

22  A. Yes.

23  **E.      Pages 52:18-53:16**

24  Q. But you acknowledge that in 2000, at some point in 2000, the City rolled 16 hours

25  of overtime into the base pay?

26  MR. TALBOT: Are you asking a question --

27  MS. BRIGGS: Yes.

28  MR. TALBOT: -- if that's her understanding of what they did?

1    MS. BRIGGS:  Yes.

2    THE WITNESS:  It's my understanding that they rolled the amount of money we had

3    been making for our regularly-scheduled overtime into our base wage.  I -- based on that or

4    checking the exact percentages.

5    **F.    Pages 54:9-53:4**

6    Q.  So you noticed that this line item on your check was different.  Did you notice

7    whether pay for your 20 regularly-scheduled hours, so assuming you hadn't picked up an

8    extra shift -- was there any change in your paycheck from before?

9    MR. TALBOT:  Are you talking about the total amount of compensation paid by the

10   City for a two-week period?

11   MS. BRIGGS:  Correct.

12   THE WITNESS:  Well, I don't remember if there was anything additional on that

13   check or not.  So, I would say that in regards to just those two lines, just the scheduled

14   overtime, that it was put in there and that there was -- rather than being written in two

15   spaces, it was written in one as a completed number.  And I'm assuming their addition was

16   correct, so

17   MS. BRIGGS:  Q.  But comparatively, from when before it was implemented, was

18   your pay for the pay period about the same?

19   A.  Yes.

20   **DEPOSITION OF WILL JOHNSON:**

21   **A.    Pages 31:4-32:8**

22   Q.  When you were a fire telecommunicator, did you sleep while you were on duty?

23   A.  Yes.

24   Q.  Did you have a sleep schedule?

25   A.  Um, yes.

26   Q.  Can you describe that sleep schedule for me?

27   A.  The sleep schedule, if you worked one day of your 24-hour shift, you either -- you

28   had one of two options.  You would either go to bed at 1900 hours, which is 7:00 p.m., get

1   up at 2230, which is 10:30, work until 0400, which was 4:00 a.m., go back to bed and then

2   be up at approximately 0730, which is 7:30 in the morning.  And then shift change was at

3   8:00.

4   　　　　If you worked consecutive shifts, such as two 24-hour's in a row, you would usually

5   work that schedule and instead of getting up at 7:30 in the morning you would sleep in later.

6   But, you had to be up at your position, in uniform, ready to go by no later than 11:00 o'clock

7   in the morning.  The other option for the single 24-hour shift was you went to bed at 2230,

8   which was 10:30 p.m., and then you got up at 0400, which was 4:00 a.m.

9   　　　　Q.  Okay.  The sleep schedule you've just described for me sounds like you would

10   get either five and a half or seven and a half hours of sleep.  Am I calculating that correctly?

11   　　　　A.  That's correct.  Actually, it's closer to seven probably.  Five and a half or seven.

12   **DEPOSITION OF MARIA MACIAS:**

13   **A.**　　**Page 15:12-22**

14   　　　　Q.  Do you like working 24-hour shifts?

15   　　　　A.  Yes.

16   　　　　Q.  What do you like about them?

17   　　　　A.  Probably the flexibility of when you work overtime, you can do it on your day off

18   when they mandate you.  It's just more flexible.  You have more days off to play with, to

19   work the overtime.

20   　　　　Q.  Because you only work about ten shifts a month?

21   　　　　A.  Right.  So you have 20 days to work -- fit that into your schedule somehow.

22   **B.**　　**Page 31:12-23**

23   　　　　Q.  Is it your understanding that your current base salary compensates you for your

24   regularly-scheduled overtime?

25   　　　　A.  Yes.

26   　　　　Q.  So your formula took that into account?

27   　　　　A.  My base salary?

28   　　　　Q.  I'm sorry.  Your calculation took that into account?

1    A. Yes.

2    Q. That you've been compensated something for your regularly-scheduled overtime?

3    A. Yes.

4   **DEPOSITION OF LINDA MAGER:**

5   **A.**  <u>**Pages 13:13-14:9**</u>

6    Q. Do you like working 24-hour shifts?

7    A. Yes.

8    MS. MILLER:  Objection, irrelevant.

9    MS. BRIGGS:  Q. You can answer, please.  Do you like working 24-hour shifts?

10   A. Yes, I do.

11   Q. Why is that?

12   MS. MILLER:  Objection, irrelevant.

13   MS. BRIGGS:  Q. You can answer.

14   A. It just works out good for my own personal life.  You get to know the people you

15  work with when you're on the 24 hours.  Just, I think, my own personal life it works out best.

16   Q. Have you ever told anyone -- Have you ever told any of your supervisors that you

17  prefer a 24-hour shift?

18   A. Yes.

19   Q. Who have you told?

20   A. I've probably told all three of them.

21   Q. That would be Jaime Hughes --

22   A. Jaime Hughes, Mary Coronado and Audrey Mills.

23  **B.**  <u>**Page 20:17-22**</u>

24   Q. But you know that some overtime was rolled into base salary?

25   MS. MILLER:  I'm going to object it calls for speculation.

26   MS. BRIGGS:  Q. If you know.

27   A. Yes.  I know some was rolled in.

28  ///

**C.**     <u>Pages 25:5-19</u>

Q. Do you have sleep breaks while you're on duty?

A. Yes, we do.

Q. Do you know -- Are you familiar with how those breaks are scheduled?

A. Um, there's two different versions of the sleep. Um, one of them is three people go down at 7:00 o'clock until 10:30. Three people are up during that time. And then those people get up, and the other three go down from 10:30 to 4:00. And then the first three go back down from 4:00 until the end of shift, and the second group of three get up at 4:00 and work.

Q. And, obviously, you were permitted a sleep or rest period while you were on duty?

A. Yes.

**D.**     <u>Page 27:1-10</u>

MS. BRIGGS: Q. Okay. Can you, please, explain to me, the schedule that you just described is a five-and-a-half-hour scheduled sleep time or a seven-hour scheduled sleep time?

A. Well, the seven-hour scheduled sleep time, it's broken up. It's three and a half and then they're up and then it's four.

Q. Do you presently sign off for sleep time while you're on duty?

A. No.

**E.**     <u>Page 29:18-24</u>

Q. Do you know if scheduled sleep time for the fire telecommunicators was more than three hours per shift?

A. It could -- Sometimes it was.

Q. But you only had to sign off on three hours?

A. Right. Correct.

**F.**     <u>Page 33:4-6</u>

Q. You mentioned that three hours per shift was signed off on by the fire telecommunicators?

1    A. Correct.

2    **G.**    **Page 48:10-12**

3        Q. Do you know if during that time period fire telecommunicators were granted an

4    increase in pay?

5        A. No.

6    **DEPOSITION OF AUDREY MILLS:**

7    **A.**    **Page 28:14-21**

8        MS. BRIGGS: Q. Okay. How do you like working 24-hour shifts?

9        A. I like working a 24-hour shift.

10       Q. And why is that?

11       A. It works well for my family. I'm able to participate in my girls' activities. And

12   having the weekdays off has been very nice, also, get a lot of things done.

13   **B.**    **Pages 51:25-55:3**

14       Q. What is your understanding presently how your overtime, your regularly-

15   scheduled overtime is compensated?

16       MR. TALBOT: Objection. Vague, overbroad as to "compensated."

17       MS. BRIGGS: Q. You can answer.

18       A. Are you talking about -- May I ask you a question?

19       Q. Uh-huh.

20       A. Are you talking about how our overtime is being calculated or --

21       Q. You have, as a part of your work week, the Kelly schedule that we just went

22   through.

23       A. Yes.

24       Q. You either work 48 hours a week or you work 72 hours a week?

25       A. (Nods head.)

26       Q. Is that "yes"?

27       A. Yes.

28       Q. So as a part of your schedule, you have regularly-scheduled overtime?

---

1    A. Yes.

2    Q. Do you have an understanding about how you are presently compensated for

3    regularly-scheduled overtime?

4    A. Yes.

5    Q. What is your understanding?

6    A. For regularly-scheduled overtime?

7    Q. Yes.

8    And do you know what I mean when I say that concept?

9    A. I believe so.

10   Q. I'm not talking about an extra shift.

11   A. Just our built-in overtime.

12   Q. Correct.

13   A. Yes, I do.

14   Q. And what is that understanding?

15   A. Well, on our 48-hour work week, it's when we work two shifts that week, and our

16   72, we work three shifts that week.

17   Q. Okay.  And my question was:  Do you have an understanding of how you were

18   compensated for regularly-scheduled overtime?

19   MR. TALBOT:  And you're asking for how the City presently compensates them for

20   this regularly-scheduled overtime?

21   MS. BRIGGS:  Yes.

22   THE WITNESS:  I have an understanding, but I'm not sure how -- calculation-wise,

23   I'm not exactly sure how that's calculated.

24   MS. BRIGGS:  Q.  So you have a general understanding then?

25   A. Yes.

26   Q. And can you tell me what that general understanding is?

27   A. I can, but I can't explain it.  I'm sorry.

28   Q. You just used the term "built-in overtime" a moment ago.  What did you mean

1   when you said that?

2        A. Well, anything over 40 hours a week in our work week, which means it would be

3   eight hours above the 40 hours is our built-in overtime for the week. And on our 72-hour

4   work week, it's the hours over 40 as built-in overtime.

5        Q. And do you know if this built-in overtime is added to your base salary?

6        MR. TALBOT: Okay. I'm going to object here. It's vague and confusing because

7   she's talking about overtime hours are regularly scheduled and built in, and you're talking

8   about a concept of compensation for those hours.

9        MS. BRIGGS: Q. If you know.

10       A. I'm sorry. I don't know that.

11       Q. But someone has explained that concept to you before?

12       MR. TALBOT: Objection. Vague and overbroad as to "that concept."

13       MS. BRIGGS: Q. The concept of built-in overtime being added to your base salary.

14       A. Yes, someone has.

15   **C.**   **Pages 46:20-47:2**

16       Q. And does this letter indicate that a grievance would not be filed on behalf of the

17   fire telecommunicators' supervisors?

18       MR. TALBOT: Objection. The document speaks for itself.

19       MS. BRIGGS: Q. Was that your understanding of the document when you read it?

20       A. Yes.

21   **D.**   **Pages 55:15-56:17**

22       Q. Are the fire telecommunicators provided a sleep schedule while they're on duty?

23       A. I'm not exactly sure. What do you mean by "a sleep schedule"?

24       Q. Are fire telecommunicators provided sleep time during their duty?

25       A. Yes.

26       Q. Okay. And is that sleep time pursuant to a schedule?

27       A. We have hours that we sleep. I'm not sure if it's considered a schedule.

28       Q. Is there something called a "down up down"?

1      A. Yes.

2      Q. Okay. Is that a sleep schedule?

3      A. It's something that we just came up with. I'm not -- It's really not a schedule. It's

4  just hours that we -- we, for lack of a better term, schedule, I guess. Yes.

5      Q. What term would you use if not "schedule"?

6      A. "Provided," I guess.

7      Q. Okay. What hours are provided for them to sleep?

8      A. For instance, the down up down that you've referred to, a person goes to bed at

9  7:00 p.m, gets up at 10:30 p.m., and stays up till 4:00 a.m. and then rests from 4:00 a.m. to

10  the time that they get off work, which is 8:00 a.m.

11  **E.**    **Page 60:9-21**

12      Q. And do you know if in this time period -- Do you know if in this time period the

13  down up down sleep schedule that you described was in effect?

14      MR. TALBOT: Are we talking about May 9, 2000?

15      MS. BRIGGS: Yes. Thank you.

16      THE WITNESS: Possibly. I'm not sure specifically.

17      MS. BRIGGS: Q. The sleep schedule that you described provided more than three

18  hours of rest time or sleep time.

19      MR. TALBOT: Provided an opportunity for more?

20      MS. BRIGGS: Yes.

21      THE WITNESS: Yes.

22  **F.**    **Page 82:4-12**

23      Q. This salary schedule shows a monthly salary for a fire telecommunication

24  supervisor at $4,881. This is about a 25-percent increase in your monthly salary from May

25  of 2000 to January of 2001, which is about an eight-month period. In the 24 years that

26  you've worked for the City, have you ever received a 25-percent increase in your base

27  salary in an eight-month period?

28      A. No.

1   **DEPOSITION OF CARL MORROW:**

2   **A.**   <u>**Page 17:4-17**</u>

3       Q. Is there a schedule for sleep time for the fire telecommunicators?

4       A. There is allotted time that we can go down, yes.

5       Q. What is that allotted time fire telecommunicators are permitted to go down?

6       A. Well, we have two different schedules.  One is a up-sleep where you get two

7   sleep times with one interruption in the middle, which is from 7:00 to 10:30 at night; you're

8   up from 10:30 to 4:00 in the morning; and then back to bed between 4:00 and 8:00.  And the

9   other one's opposite.  You work till 10:30 at night, and you're in bed from 10:30 to 4:00 in the

10  morning and then back up.

11  **DEPOSITION OF CANDICE PRICE:**

12  **A.**   <u>**Pages 14:20-15:18**</u>

13      Q. Do you prefer 24-hour shifts?

14      A. Yes.

15      Q. Why is that?

16      A. It's easier for my schedule.

17      Q. Can you elaborate a little more?

18      A. You know, it's just I'm a single parent and it's easier for me to spend more time

19  with my kids when I'm on a 24-hour shift.

20      Q. How many days do you work a month?

21  MR. TALBOT:  Objection as --

22  MS. BRIGGS:  Q. How many shifts are you regularly scheduled for in a month?

23      A. I'm regularly scheduled for approximately ten.

24      Q. And someone who works a traditional 40-hour work week works more shifts in a

25  month?

26  MR. TALBOT:  Objection, vague as to "shifts," "40-hour schedule."  It's also

27  speculative as to what others work.

28      MS. BRIGGS:  Q. If you worked a traditional 40-hour schedule, which is 9:00 to 5:00,

1   five days a week, would you have as much time to spend with your child?

2       A. No.

3   **B.    Pages 17:6-18:24**

4       Q. Do you know if the fire telecommunicators ever voted on a pay proposal in that

5   time period?

6       A. I do not know if we did or not.

7       Q. Are you aware of any type of pay proposal in that time period affecting the fire

8   telecommunicators?

9       A. I know that we received one, but I don't know if we voted on it. I cannot recall if

10  we ever got notice of it.

11      Q. When did you receive it?

12      A. Oh, I don't know the exact date.

13      Q. Can you recall what the elements of that pay proposal were?

14      A. I believe it's when they were supposed to roll over our FLSA, and also when they

15  were supposed to stop taking away the three hours per shift. But then also around that time

16  period, the first of the year, I received my two-percent raise also, so that's in there, also.

17      Q. Can you recall this went on around the time period of late 2000?

18      A. Probably. I don't recall the exact date.

19      Q. You said "roll over our FLSA." What do you mean by that?

20      A. I mean when you have a -- It used to be when we worked the 24-hour shift on/48

21  hour off, there were times when you would have a Fat Week. You would work Sunday,

22  Wednesday and Saturday, and you got paid overtime for that.

23      And what would happen is if you wanted to take vacation or if you were sick, if you

24  did -- if it was during that Fat Week, you would lose it. So, you had to actually, physically be

25  there or have someone working for you during those three days to be able to get that pay.

26      So what they supposedly did was they rolled it into our base wage, so you wouldn't

27  lose it.

28      Q. So you wouldn't lose it if you called in sick or took a vacation?

1    A. Right.

2    Q. And you say "supposedly," do you have reason to believe that did not happen?

3    A. Well, it was just never explained to me, so I would not know if it was correctly

4    done or not.

5    **C.**    **Page 29:9-22**

6    Q. Just to clarify, you also said that currently -- Well, maybe you didn't say this. You

7    explained a concept to me that during your Fat Week, if you took a vacation or a sick day,

8    you'd lose your overtime?

9    A. Uh-huh.

10    Q. Can you vocalize?

11    A. Yes. I'm sorry. Yes.

12    Q. Presently, if you take a sick day or a vacation day during a week where you would

13    have three shifts in one week, do you know what the consequences to your pay?

14    A. I don't believe there are any consequences.

15    **D.**    **Page 39:13-23**

16    MS. BRIGGS:  Q. Okay. It was just your testimony that the 25-percent increase was

17    because the FLSA from the Fat Week was rolled into the base pay.

18    A. Yes.

19    Q. Okay.

20    A. But it actually was not an increase for us because we would normally work that

21    anyway. You would protect your Fat Week, and so you would normally get that. So, we did

22    not get a raise. It just showed up in our base pay instead of having the lower base and

23    having a separate line for your Fat Week.

24    **E.**    **Pages 38:23-39:23**

25    Q. That's about a 25 percent increase in pay for a base salary. Do you know the

26    reason why that went up over 25 percent?

27    A. That was our FLSA that got rolled in for the Fat Week, as far as I know, and not

28    signing off the three hours.

1    Q.  So then your pay stubs after about January of 2001 for a base salary would

2    include, roughly, 16 hours of overtime per week?

3        MR. TALBOT:  I'm going to object --

4        THE WITNESS:  I don't know.

5        MR. TALBOT:  -- calls for speculation, 16 hours of overtime.  We haven't defined

6    what overtime is.  We haven't laid a foundation for this witness to know what that includes.

7        MS. BRIGGS:  Q.  Okay.  It was just your testimony that the 25-percent increase was

8    because the FLSA from the Fat Week was rolled into the base pay.

9        A.  Yes.

10       Q.  Okay.

11       A.  But it actually was not an increase for us because we would normally work that

12   anyway.  You would protect your Fat Week, and so you would normally get that.  So, we did

13   not get a raise.  It just showed up in our base pay instead of having the lower base and

14   having a separate line for your Fat Week.

15   **DEPOSITION OF VIRGINIA RUIZ:**

16   **A.    Page 20:11-15**

17       Q.  Do you like working 24-hour shifts?

18       A.  Yes, I do.

19       Q.  And why do you like them?

20       A.  Um, it affords me a lot of time off with my family.

21       Q.  Why is that?

22       A.  Because you have -- you work one day and you're off a full day, and then four

23   days off.  It's really nice.

24       Q.  And how many shifts do you work in a month?

25       A.  Approximately 12, I think.

26       Q.  Is it ever as few as ten regularly-assigned shifts?

27       A.  Could be.

28   ///

1  **B.**   **Page 22:15-18**

2      Q. Are you presently -- Presently, are you provided an opportunity to take sleep

3  breaks or rest periods during your shift?

4      A. Yes.

5  **C.**   **Page 42:2-11**

6      Q. The letter that -- Defendants' 1, the letter from Paul Goyette, which explains to the

7  Plaintiffs -- which explains to -- your name appears on the letter and you read the letter.

8  And I believe it explains to the Plaintiffs that the City has rolled overtime compensation into

9  base pay.

10      A. Uh-huh.

11      Q. Are you aware if that is the current practice of the City?

12      A. Yes.

13  **D.**   **Page 49:9-14**

14      Q. So what is your understanding of the 25 percent raise?

15      MS. MILLER:  Objection.  Assumes facts not in evidence.

16      MS. BRIGGS:  Q. You can answer.

17      A. I didn't get a 25 percent raise.

18  **DEPOSITION OF CARMEN SIMMONS:**

19  **A.**   **Page 13:7-18**

20      Q. Did you ever tell anyone at the City that you prefer 24-hour shifts?

21      A. Yeah and no. Yes, I did like the 24-hour shifts, but as I said earlier, I don't know

22  how the other shifts would be because I was never given a chance to do that or we just

23  didn't have that other schedule. So I liked working the 24-hour shifts.

24      Q. Did you convey that preference to anyone?

25      A. Everybody knew I liked 24-hour shifts.

26      Q. When you say "everybody," could you be a bit more specific?

27      A. People on my team, on my shift.

28  ///

---

Def City Of Stockton's Depo Excerpts to be
Offered at Trial
    27    
*Hughes, et al. v. City of Stockton, et al.*
Case No.  CIV. S-03 0166 MCE-DAD

**B.**   **Page 39:2-6**

MS. BRIGGS:  Q.  Okay.  While you were working for the City, in any eight-month period or even in any one-year period, did you receive a 25-percent increase in pay?

A.  No.

**C.**   **Page 41:3-23**

Q.  In late 2000/early 2001 did anyone ever tell you that the increase in your base salary represented compensation for this regularly-scheduled overtime?

A.  Anyone being who; anybody from the City, as far as notification?

Q.  Any fire telecommunicator, anyone from the City, Wally Storm.

A.  I don't think anything was brought up until after we questioned the overtime.  And then that's when they said that they had rolled the overtime into the salary.

Q.  Who is "they"?

A.  I don't know exactly who it was.  I mean, I'm just getting it from my supervisor, so whoever the City is.  I don't know if that would be Chief Gillis.  I don't know if that would be Personnel.  I'm not sure.

Q.  So did your supervisor convey that concept to you then?

A.  That that's what they were trying to say, yes.

**D.**   **Page 52:5-10**

Q.  Do you have -- You earlier testified that someone had told you that overtime pay was being rolled into base salary?

A.  Yes.

Q.  Were you aware of that in January of 2001?

A.  Possibly.

**E.**   **Page 39:7-24**

Q.  Did you happen to notice on the salary schedules while you were working for the City that there was an over 25-percent increase in pay in the salary schedule?

A.  Yes.  Not in the schedule, not in the salary schedule, but on my pay stub.  That's where I noticed the difference.

1    Q.  Where did you notice the difference?

2    A.  Top line of my pay stub, the salary line.

3    Q.  What about the salary line?

4    A.  That's where the increase was.

5    Q.  There was an increase?

6    A.  It was in the base, the base salary line.

7    Q.  Your base salary was increased?

8    A.  Yes.

9    Q.  By approximately 25 percent?

10   A.  I never calculated it, so I don't know.  But, according to these documents, yes.

11   **F.**   **Pages 74:14-75:22**

12   Did you know whether some of the fire telecommunicators were attempting to file a

13   grievance regarding their pay?

14   A.  Yeah.  Well, we were questioning it.  I don't know as far as a formal grievance.  I

15   don't know what that process entailed.

16   Q.  They were questioning their pay?

17   A.  (Nods head.)

18   Q.  Did you read this letter?

19   A.  In 2001, yeah.

20   Q.  Did you understand what it meant in 2001?

21   A.  Yeah.  Basically that our attorney for our union wasn't going to back us or support

22   us.  That's how I understood it.

23   Q.  And why is that?

24   A.  I don't know his reasoning behind it.

25   Q.  Did you --

26   A.  I can tell you what my assumptions were, but those aren't really -- those really

27   don't matter.

28   Q.  Did he articulate his position in the letter as to why he was not pursuing a

1    grievance?

2    MR. TALBOT:  Objection, the letter speaks for itself.

3    MS. BRIGGS:  Q.  Obviously, you read the letter.

4    A.  Uh-huh.

5    Q.  So you, obviously, read the section that says:  "This change would mean that

6    some or most fire telecommunicators would move from a 24-hour to a 12-hour shift.  In

7    addition, 16 hours of FLSA overtime would be incorporated into your base salary."

8    A.  I understand that.

9    **DEPOSITION OF MARINA TORRES:**

10   A.    <u>Page 15:3-6</u>

11   Q.  Do you prefer working 24-hour shifts?

12   A.  Opposed to?

13   Q.  Graveyard.

14   A.  Yes.

15   B.    <u>Page 15:16-21</u>

16   Q.  You said that you would prefer the 24-hour to the graveyard.

17   A.  Uh-huh.

18   Q.  Did you ever discuss that with anyone, discuss that preference with anyone?

19   A.  Dave Hafey.

20   C.    <u>Page 18:2-24</u>

21   Q.  Were you involved in any discussions or meetings with the SCEA and the City

22   regarding compensation for fire dispatchers in the summer of 2000?

23   A.  I was involved in meetings regarding fire telecommunicators.

24   Q.  Who else was at those meetings?

25   A.  George Bist, Mark Parrot attended at least one meeting that I can think of, Wally

26   Storm, Mary Morley and Lehua Macias.

27   Q.  Approximately how many meetings did you attend?

28   A.  Three, approximately three.

1    Q.  What was the subject of those meetings?

2    A.  George Bist had stated that they were going to place a -- the City was moving

3    towards placing fire telecommunicators on a 40-hour work week, and he discussed the

4    benefits that they would be receiving.  I believe that was pretty much the discussion for the

5    hours.

6    Q.  Did George Bist indicate that he was going to move all fire telecommunicators to

7    a 40-hour work week?

8    A.  No.

9    **D.**    **Pages 20:23-21:19**

10    A.  That was one of our major concerns, was that we be compensated correctly for

11    holiday pay.  Also, the signing off of sleep time.  And it brought the issue up of us losing our

12    -- what we considered to be our Fat Week.  Before, if we took either an annual 24-hour shift

13    or if we had to call in sick for 24 hours, we would lose our Fat Week.

14    Q.  So your compensation would go down?

15    A.  Yes.

16    Q.  So compensation was a concern of the union?

17    A.  Well, when you say "compensation," that's not what I consider -- What's your

18    definition of "compensation"?

19    Q.  Would your pay be lower if you called in sick during your Fat Week?

20    A.  Yes.

21    Q.  So that was a concern of the union in regards to these discussions?

22    A.  Yes.

23    Q.  So compensation was a concern?

24    A.  Yes.

25    **E.**    **Page 24:11-14**

26    MS. BRIGGS:  Q.  Did you ever meet with George Bist, Mark Parrot, Wally Storm and

27    Mary Morley at Mallard's Restaurant?

28    A.  Yes.

**F.**   **Pages 26:18-27:3**

Q.  Do you recall discussing FLSA overtime?

A.  Only in regards to sick leave.

Q.  And can you elaborate for me, please?

A.  The Fat Week, going back to the Fat Week and us losing our Fat Week if we decided to take either a vacation day or if we had to call in sick.

Q.  In the past, prior to 2000, if you called in sick or take a vacation day on your Fat Week, would your compensation for that week be lower than if you had not taken a vacation day or a sick day?

A.  Yes.

**G.**   **Page 27:6-15**

MS. BRIGGS:  Q.  Presently what happens when you take a vacation or a sick day during a week where you have three shifts in one week?

MR. TALBOT:  Objection.  Vague as to "what happens."

MS. BRIGGS:  Q.  What happens to your pay?

A.  It remains the same.

Q.  Are you aware that that was an element of a pay proposal the City adopted?

A.  Yes.

**H.**   **Page 29:10-25**

MS. BRIGGS:  Q.  What happened at the conclusion of all the meetings?

A.  Of the meetings I was involved with, basically, George stated that they were pushing through the 40-hour work week for the fire telecommunicators and the 24-hour employees were to remain the same.  Other than that, there was nothing else.

Q.  They were pushing through what?

A.  The 40-hour fire telecommunicator position.

Q.  And the 24-hour employees will remain the same?

A.  Correct.

Q.  What do you mean by that?

Def City Of Stockton's Depo Excerpts to be
Offered at Trial                                   32          *Hughes, et al. v. City of Stockton, et al.*
Case No.  CIV. S-03 0166 MCE-DAD

1    A. Nothing would change for a 24-hour employee.

2    **I.**    **Page 43:8-10**

3    Q. Has anyone ever told you that your current base salary includes regularly-

4    scheduled overtime?

5    A. I have heard that, yes.

6    **J.**    **Page 45:1-19**

7    Q. Are they provided with rest or sleep periods?

8    A. Yes.

9    Q. And are those rest periods taken in a rotation?

10    A. Yes.

11    Q. Can you describe that rotation for me, please?

12    A. We're at a minimum staffing of six during the evenings from 6:00 on, 6:00 p.m. on.

13    The first three fire telecommunicators will start their rest time at 7:00, if allowed by the

14    circumstances in the center, and are allowed to rest until 10:30 p.m., when they're at that

15    point out on the floor to relieve the other three.  And their rest time starts from 10:30 and it

16    goes on till 4:00 a.m., at which time they switch again.

17    Q. So during your 24-hour shifts, do you sleep during your shift?

18    A. We do have a rest time, yes.

19    **K.**    **Page 47:6-8**

20    Q. During the time that you were required to deduct the three hours, you were

21    provided a rest period?

22    A. Yes.

23    **L.**    **Page 47:14-16**

24    Q. Was the sleep period more than three hours?

25    A. Yes.

26    **M.**    **Page 47:24-48:1**

27    Q. Presently the sleep schedule that you just described for me, I believe you said

28    10:30 to 4:00?

1    A. Yes.

2  **N.**   **Page 50:5-8**

3    Q. And yet you're not required to sign off on any sleep time presently?

4    A. We don't see that being deducted from our paycheck, no.

5  **O.**   **Pages 55:14-56:9**

6    MS. BRIGGS:  Q. Since working for the City, have you ever received a 25-percent

7  increase in pay in the same classification at the same step --

8    A. No.

9    Q. -- in an eight-month period of time?

10    A. No.

11    Q. In a one-year period of time?

12    A. No.

13    Q. Do you know why the salary for Fire Telecommunicator II at step 6 was raised 25

14  percent in that time?

15    A. I believe because they added our scheduled overtime hours into our -- what

16  showed as our base salary, so we weren't -- we didn't receive a raise.  We were working the

17  same amount of hours, making the same amount of money.

18    Q. And you testified earlier that in sitting in those meetings in the summer of 2000

19  with George Bist, the topic of providing fire telecommunicators raises was not discussed?

20    A. Correct.

21  **P.**   **Page 57:11-19**

22    MS. BRIGGS:  Q. You just testified that the 25-percent increase in base salary was

23  because FLSA overtime for regularly-scheduled hours was included in your base pay; is that

24  correct?

25    A. No.  That's not what I said.

26    Q. Can you tell me what you said?

27    A. I said that they had included our overtime, our regularly-scheduled overtime, and

28  put that into our base pay.

1   **Q.**      **Pages 59:23-60:6**

2         Q.  Okay.  When making that calculation, based on what you just said regarding the

3   increase in base salary -- Strike that.  We just went over the fact that the 25-percent

4   increase in base salary was due to the fact that regularly-scheduled overtime is now

5   included in your base pay, correct?

6         A.  Yes.

7   **R.**      **Pages 60:25-61:6**

8         Q.  I'm not asking you what the City's position is.  I'm asking you that based on what

9   you just told me, that the 25-percent increase in pay is due to the fact that your regularly-

10  scheduled overtime is now folded into your base pay, correct?

11        A.  Yes.

12  **S.**      **Pages 69:9-71:6**

13        Q.  So as a union board member, you've never brought this concern to the attention

14  of anyone?

15        A.  I brought my concerns regarding our pay to Paul Goyette.

16        Q.  When was that?

17        A.  I don't recall.

18        Q.  Did Paul Goyette respond to you?

19        A.  He didn't respond to me.  He responded to a few of my coworkers.

20        (Defendants' Exhibit 8 was marked for identification.)

21        MS. BRIGGS:  Q.  Is this the letter that you were referring to?

22        A.  Yes.  Oh, I need to read it before, so I know for sure.  Yes, this is the letter.

23        Q.  Is the letter dated January 21st, 2001?

24        A.  Yes.

25        Q.  Did you ever read this letter?

26        A.  Yes.

27        Q.  When did you read it?

28        A.  I don't recall.

1   Q. Did you read it shortly after January 22nd, 2001?

2   A. Yes.

3   Q. I'm going to read a passage of this letter for you.  Paragraph 2, the second

4   sentence in, it says:  "Since that time, representatives of the City and the Association have

5   met on several occasions to discuss the change of the shift schedule and associated issues,

6   such as your base rate of pay and overtime compensation.  The net result of all of these

7   meetings was that the City would implement a change in your work schedule sometime

8   shortly after January 1st, 2001.  This change would mean that some or most fire

9   telecommunicators would move from a 24-hour to a 12-hour shift.  In addition, 16 hours of

10  FLSA overtime would be incorporated into your base salary, thereby increasing your base

11  salary and your related PERS contributions.  As a result, the City will not pay fire

12  telecommunicators overtime compensation until you surpass a 56-hour work week."  When

13  you read this letter, did you feel that Paul Goyette's assessment was incorrect?

14  A. I didn't know what to think.

15  **DEPOSITION OF TREASA TREDWELL:**

16  **A.**   **Page 12:4-23**

17  Q. What did you like about the 24-hour shifts?

18  A. I liked having the time off to be with my daughter.

19  Q. Was your daughter in day care?

20  A. No.  When I was working, she was with her dad.

21  Q. Did you ever tell anyone at the City that you preferred 24-hour shifts?

22  A. Yes.  When I went to graveyards.

23  Q. When did you go to graveyards?

24  A. Um, I have it written down in my check stubs.

25  Q. How long were you assigned to graveyards?

26  A. Not very.

27  Q. One month, two months?

28  A. I'd say maybe three months.

1    Q.  And during that time you communicated to someone that you preferred 24-hour

2    shifts?

3    A.  I'm sure I did, yes.

4    **B.**    **Pages 14:15-16:13**

5    Q.  While you were working as a fire telecommunicator, when you were working 24-

6    hour shifts, were you permitted to sleep, you were provided sleep breaks?

7    A.  Yes.

8    Q.  And do you know what that sleep schedule was?

9    A.  It depends on which schedule you got.  If you got up, I think it was 11:00 to 4:00,

10   and if you got dud, it was 7:00 -- No.  I'm sorry.  It was 10:00 or 10:30 to 4:00.  It's been

11   three years.  I'm sorry.  And dud was 7:00 to 10:30 and then 4:00 till you woke up or -- you

12   know, if you had to work the next day, you had to get up by 11:00.

13   Q.  So one of the sleep schedules -- Let me go back.  So there were two sleep

14   schedules:  One you were allowed to sleep from 7:00 to 10:30, and then you'd go back

15   down at 4:00 a.m. and --

16   A.  Right.

17   Q.  -- and could sleep as late as 11:00?

18   A.  Yeah.  I think it was 10:30.  I'm not sure.  I'm sorry.  I don't recall.  Yeah.  It just

19   depended if you had to work the following day.  That's when you got dud.

20   Q.  So approximately how many hours per shift, per 24-hour shift were you permitted

21   to sleep?

22   A.  It depends if you could fall asleep at 7:00 o'clock at night or not.  I couldn't.

23   Q.  Aside from the fact as to whether or not  you could fall asleep, how many hours

24   were you scheduled for sleep or rest breaks?

25   A.  Four hours, five hours.

26   Q.  You just described a sleep schedule of 7:00 to 10:30 and then 4:00 to as late as

27   11:00.

28   A.  Right.

1    Q. And that would be nine and a half hours?

2    A. Yeah. If you had to work the following day.

3    Q. If you did not have to work the following day, when did you have to wake up?

4    A. Usually -- Well, you had to work -- stay up, so you worked -- I've got to remember

5    all this. I'm sorry. It was 7:00 to 10:00 or whatever it was you sleep, then you get up until

6    4:00, and then you go back down. So, if you had to work the next day, you got dud.

7    If you didn't, then you stayed up. I know that's not coming across clearly. It's not

8    even clear in my head. It's been a while.

9    **DEPOSITION OF SHEILA WALL:**

10    **A.**    **Page 12:6-25**

11    A. No. Well, I wrote a letter to Paul Goyette in December of 2000 requesting a

12    grievance regarding my pay, along with several other coworkers. And as far as I know, it

13    didn't go anywhere. We were basically -- he responded that he wasn't going to pursue it, so

14    I don't think it actually ever made it to a grievance state.

15    Q. When you say "regarding your pay," could you be a little bit more specific?

16    A. I felt that I was not being paid properly. I'm a 40-hour employee, and I wasn't

17    being paid overtime for the hours worked above 40 hours a week.

18    Q. And what was the date of that letter?

19    A. December -- it was in December of 2000 that -- I have a copy, if you need an

20    exact date in December.

21    Q. And Mr. Goyette responded?

22    A. He did respond, and it was just that he wasn't going to pursue it, basically. Why,

23    I'm not really sure, but he was not going to pursue it.

24    **B.**    **Page 18:18-20**

25    Q. Do you prefer working 24-hour shifts?

26    A. The 24's work well for my child custody, but I can work any shift.

27    **C.**    **Pages 32:21-33:24**

28    Q. Do you sleep during your shift --

1    A. Yes.

2    Q. -- during your duty?

3    A. Uh-huh.

4    Q. What is your sleep schedule?

5    A. It varies from night to night.  We have two different sleep rotations.  One is called

6    down sleep, which you go to sleep from 7:00 at night till 10:30 at night.  And then you get

7    up, and you go back to bed at 4:00 in the morning.

8    And then the -- what's called the up sleep is from 10:30 at night till 4:00 in the

9    morning.  And those are if there's no major incidents; fires, MCI's, multi-casualty type of

10   incidents that you're woke up for.

11   Q. So how many hours do you sleep per shift?

12   MR. TALBOT: Actually sleep?  What are we asking here?

13   MS. BRIGGS: Q. How many hours are you scheduled to sleep per shift?

14   A. Again, if I sleep from 7:30, or 7:00 to 10:30, that's three and a half hours, and then

15   I go back to bed at 4:00 in the morning till 8:00.  That's four more hours.  So, that's seven

16   and a half.  If I sleep the 10:30 to 4:00, it's five and a half.

17   Q. Depending on which rotation you're on, you get five and a half hours of scheduled

18   sleep time or seven and a half hours of scheduled sleep time?

19   A. Yes.

20   **DEPOSITION OF LORIE WEISS:**

21   **A.    Pages 20:7-21:4**

22   Q. How do you like working 24-hour shifts?

23   A. I like it.  I've worked 24's most of my life, though.  Even prior to coming to the fire

24   department I worked 24-hour shifts.

25   Q. And what do you like about working 24-hour shifts?

26   A. I'm used to it, and it's convenient because of the commuting.  And I have a six-

27   year-old that I have in day care, and I feel that I get more time with him.

28   Q. Do you work approximately ten shifts a month as a part of your regularly-

1    scheduled shifts?

2         A.  The regular schedule, yes.

3         Q.  So working ten shifts a month affords you more time with your child?

4         A.  Yes.

5         Q.  Has anyone ever asked you, at the fire department, if you prefer working 24-hour

6    shifts?

7         A.  We've talked about it, yes.

8         Q.  And when you say "we," who is "we"?

9         A.  I don't remember.  I mean, it's come up with a lot of people.  So, as a general

10   conversation for a while and everybody seemed to be talking about it.

11   **B.**     **Pages 33:23-35:11**

12        Q.  Were you involved in any meetings with George Bist in the summer of 2000

13   regarding police and fire dispatchers?

14        A.  That's who told me, "This is what we're going to do," was George Bist.

15        Q.  Do you recall when he told you "This is what we're going to do"?

16        A.  I can estimate either late August or early September of 2000.

17        Q.  Do you recall what he said to you in late August or early September of 2000?

18        A.  He told me that what they are -- what they were going to do was to roll our Fair

19   Labor Standards overtime into our base salary so that they could PERS it.

20        Q.  Were you involved in any meetings with Mark Parrot in late August/early

21   September of 2000?

22        A.  He was also at the meeting with George Bist that I attended.

23        Q.  So you attended a meeting with George Bist, and at that meeting he told you what

24   the City was going to do?

25        A.  Told me what they were going to do, and Mark Parrot was also present at that

26   meeting.

27        Q.  At any time prior to that meeting did George Bist solicit your input regarding the

28   proposals from the City?

1    A. I don't remember if it was George Bist or Mark Parrot that wanted me to come up

2   with another type of schedule and told me what he wanted on it.  He wanted 12-hour shifts.

3   And to get it to average out, I'd have to throw some eight-hour shifts in there.  Only wanted

4   24 employees and gave me a breakdown on the hours per day, how many employees he

5   wanted present on duty at the time.  And then I was supposed to come up with a schedule

6   with that.

7    Q. And you said that was requested from either George Bist or Mark Parrot?

8    A. Yeah.

9   ///

10  **C.**    **Page 114:12-16**

11   Q. Were there ever shifts where you slept more than three hours, but only signed off

12  for three hours?

13   A. Yes.  Three hours was the number that the administration came up with, is what

14  they wanted.

15  **D.**    **Pages 38:21-39:5**

16   MS. BRIGGS:  Q.  So did your discussions ever center on folding overtime for fire

17  telecommunicators into the base salary?

18   MR. TALBOT:  Objection.  Vague as to "folding."

19   MS. BRIGGS:  Q.  Adding.

20   A. He talked about putting the regularly-scheduled hours overtime, the Fair Labor

21  Standards hours, that portion of the overtime, rolling it into the base, so that they could pay

22  the PERS on it.

23  **E.**    **Page 42:5-10**

24   Q. But, have other fire telecommunicators expressed a desire, to you, to work

25  something -- to work 10 to 12-hour shifts rather than a 24-hour shift?

26   A. I've only heard it from one person.

27   Q. Who was that person?

28   A. Jaime.

**F.**     **Page 60:9-18**

Q.  So do you have a specific recollection as to what he said when he said, "This is what we're going to do"?

A.  He said, "What we're going to do is to roll your Fair Labor Standards overtime, which is all the hours past 40, into your base salary, so that we can pay the PERS on it."

Q.  And at this time were you the representative for fire telecommunicators?

A.  Yes.

**G.**     **Page 62:18-25**

Q.  You mentioned to me that during that meeting when he said, "This is what we're going to do," he had mentioned that the City was going to add regularly-scheduled FLSA into base salary?

A.  (Nods head.)  Yes.

Q.  Did you object to that component during the meeting?

A.  No.

**H.**     **Pages 66:16-67:22**

Q.  Okay.  So are you aware that George Bist's proposal of adding regularly-scheduled overtime into base pay was implemented by the City?

A.  Yes.  Because instead of having an overtime line, it was now on the base salary line.

Q.  And when are you aware that that happened?

A.  2001.

Q.  Okay.  And did you become aware -- How did you become aware that that was implemented?

A.  When my paycheck changed.

Q.  And do you know if the other fire telecommunicators, if you know, had a similar understanding in that same time period?

A.  Yes.  I believe we all noticed it when our paycheck changed.

Q.  Okay.  And when the -- To your recollection, the paycheck changed the beginning

1    of 2001?

2           A.  I think it was the first part of 2001.

3           Q.  Okay.  And in the first part of 2001, did any fire telecommunicators express anger

4    over what the City and the union presumably agreed to?

5           MR. TALBOT:  Okay.  I'm going to object as to the word "anger."  I'm going to object

6    as to speculative and I'm going to object as to vague.

7           MS. BRIGGS:  Q.  Any displeasure about the what the union and the City --

8           MR. TALBOT:  The same objection.

9           MS. BRIGGS:  Q.  -- presumably agreed to?  If you know.

10          A.  I didn't hear any -- I didn't have any conversations with anyone that –

11   **I.    Pages 69:21-70:9**

12          Q.  You also said earlier that you attempted to file a grievance on this matter.  Do you

13   recall when that was?

14          A.  No.

15          Q.  Okay.  And when you say "attempted," why do you say "attempted"?

16          A.  Because it never got to the point of a grievance.

17          Q.  And why is that?

18          A.  The union's attorneys didn't put it through.

19          Q.  And do you know why the union's attorneys did not put the grievance through?

20          A.  They didn't believe we had a case.

21   **J.    Pages 70:16-72:11**

22          Q.  Has Paul Goyette written you a letter regarding the filing of a grievance?

23          A.  There was one.  I can't remember when it was, but yes, there was one.

24          Q.  In that letter did Paul Goyette provide you with an explanation as to why he would

25   not be filing a grievance or -- I'm sorry -- as to why a grievance would not be successful?

26          MR. TALBOT:  Objection.  The letter speaks for itself.

27          MS. BRIGGS:  Q.  You can answer.

28          A.  I'd have to read the letter again.  I don't recall.

1    (Defendants' Exhibit 7 was marked for identification.)

2    MS. BRIGGS:  Q.  Do you recognize this document?

3    A.  Yes.

4    Q.  Is this a letter that you received from Paul Goyette?

5    A.  Yes.

**K.**    **Page 87:22-24**

6

7    Q.  Do you know of any pay increases that the fire telecommunicators have received

8    since 1999?

9    A.  Other than the cost of living, no.

**L.**    **Pages 91:20-92:8**

10

11    Q.  And in January of 2001 the base salary for a Fire Telecommunicator II at step 6

12    was $4,118?

13    A.  Yes.

14    Q.  And this is an increase of approximately 25 percent in eight months from May of

15    2000?

16    A.  The difference comes in because they took the Fair Labor Standards part of our

17    regular schedule off of the overtime line and put it on the base salary line.

18    Q.  And the question is:  Is the increase approximately 25 percent?

19    MR. TALBOT:  If you know.

20    MS. BRIGGS:  Q.  If you know.

21    A.  Okay.  Yeah.

**M.**    **Page 92:9-12**

22

23    Q.  All right.  Since 1985, since the time you worked for the City, have you never

24    received a 25 percent increase in pay in an eight-month period?

25    A.  No.

**N.**    **Page 93:2-14**

26

27    MS. BRIGGS:  Q.  If the base salary rate is 25 percent higher in January of 2001,

28    would it then raise your hourly rate correspondingly?

1      A.  It should.

2      Q.  But it's your testimony that you knew of no pay raise granted to the fire

3   telecommunicators in this time period?

4      A.  No, because they -- all they did was move the Fair Labor Standards off the

5   overtime line and put it on the base line.  So, I mean, we were still getting the same amount

6   of money, our salary was still the same, except now instead of being on two lines, it was on

7   one line.

8   O.    **Page 94:8-15**

9      Prior to 2000, if you called in sick or took a vacation day during a Fat Week, the

10  number of overtime hours you worked would decrease?

11     A.  Yes.

12     Q.  Since 2000, if you called in sick or took a vacation during your Fat Week, you still

13  got credit for time worked; is that correct?

14     A.  Yes.

15  P.    **Pages 100:9-101:3**

16     MS. BRIGGS:  Q.  Do you believe your hourly rate was increased by 25 percent?

17     A.  As far as working for our regularly-scheduled hours, no, because somebody

18  ended up exactly the same as what we were getting before.

19     Q.  So what ended up exactly the same as what you were getting before?

20     A.  The outcome.

21     Q.  So you're still making the same as you did in May of 2000, roughly?

22     MR. TALBOT:  Objection.  Vague as to "making the same."  You haven't defined the

23  parameters for that.

24     MS. BRIGGS:  Q.  Well, you said you're getting the same as you were before.  What

25  do you mean by that?

26     A.  The end result was the same.  If I did not work any additional overtime and

27  worked only my regular schedule and did that -- and, say, there was no cost-of-living

28  increase, and I did that in 2000 and then I did it again in 2001, the end result would have

1 | been exactly the same amount of money.  There'd be no change.

2 | Respectfully submitted,

3 | Dated:  June 22, 2005 MEYERS, NAVE, RIBACK, SILVER & WILSON

5 | By: _____/s/_____
6 | Laura Lee Briggs
Attorney for Defendants

7 | 766104; 146-6001